First, please call the last case. Counsel, please. Good morning, Your Honors. Please, the Court. Chuck Candiano for George Jernigan. Your Honors, this is a case about a man who had great responsibility with his company, who acted as a general agent for his employer for years. His unrebutted testimony was that he was responsible for recruiting, hiring, and firing local labor to assist with large jobs, such as the installation of new presses. At the start of your argument, Counsel, did you include the orders in your brief? I beg your pardon, sir? Did you include the orders in your brief? From the Commission, Your Honor? I guess. Yes. Did they? The orders from the Commission, from the Circuit Court, were all, I'm sorry, they're not with the brief, they're with the appendix, Your Honor. Is that the question that you're asking? Did you file a separate appendix? I don't have one. Perhaps they're just part of the record. I know we brought them to the Court, specifically. Where? Here, sir, to the clerk. You're saying you filed a separate appendix when you filed your brief? I can't say whether it was filed as an appendix, Your Honor. I know that the, I know that they were tendered. The original decision and order from the arbitrator, the decision and order on review, the order from the Circuit Court, all were? Were bound and presented to the clerk. I believe so, Your Honor. I believe so. You either know or you don't know. I cannot state to the Court that they were bound. I know that they were provided. Please proceed. Your Honors, with regard to the arbitrator's findings, as I noted in the brief, this case is far less nuanced than those which the Court has heard earlier today. The findings of fact, to be frank, in the arbitrator's decision are either inaccurate or incomplete on their face and can be demonstrated to be so. For example, the arbitrator states that Mr. Jernigan injured his back in 1993 and returned to work for the Respondent in 1996. While it is true that he did. Did any workers compensate cases for those prior injuries? No, sir. Well, if I may, the employer opened a work comp file. The employee never filed a claim with the Industrial Commission relative to these matters. Mr. Jernigan was diagnosed as having sustained a herniated lumbar disc from the accident in January of 1993. He eventually was taken off work on November 25th of 1993 and lost about four and a half months of work, during which time he underwent a lumbar fusion and decompression. Without going through the details of every one of those, is it fair to say there's evidence in the record that Mr. Jernigan had a history of back problems prior to allegedly falling into this pit in Brazil in 2000? Is that a fair statement? He absolutely had a number of firework injuries, Your Honor, many of which are documented. As you well know, whether or not a causal connection exists is a question of fact, but the Commission and the burden is upon you to prove the case. But there's some troubling aspects of the case I think you need to hone in on. Please. That being, he returns to the United States, seeks treatment for the August 2000 injury, and doesn't mention anything for years to his treating physicians about this fall into the pit, about having anything to do with an accident in Brazil. Why is that? Why does he not mention this incident that allegedly gave rise to the back problems? Your Honor, it is expressly recorded in the first report of injury that was authored by Respondent's own supervisor, Mr. Ronald Stewart, the only person superior to Mr. Jernigan in field operations for Goss operations worldwide. But why does he not mention it to his treating physicians? Let me take the history. It's not in there. My belief, Your Honor, is that his treating physicians had seen him for, you have to know how George Jernigan's brain worked, if you will. Is that in the record, how his brain worked? It is not, Your Honor. But in point of fact, it is what made him so valuable to his employer, that he looked beyond, no, if anyone had ever asked him whether there was a discreet injury, he would have told them. And apparently he did tell his supervisor immediately after it happened, because it's recorded in detail in the accident report. Excuse me. Didn't he actually give Dr. Lansman and possibly some other treating doctors a history of having fallen on ice several years earlier? And he had back pain since then? Yes. Because he was asked for a history, and the history he gave was to a prior injury. The history that Mr. Jernigan provided, Mr. Jernigan's explanation for that question was that it was his understanding that the doctors were asking him, when did your back pain begin, what is the genesis, what is the seminal point of your having problems with your back? And to that he responded that in 1993, I fell. And from that time, I have had back problems. And the record is clear that he did experience significant back problems. And it was five years before he told Dr. Lansman about this alleged fall into the pit, right? And at that point, Dr. Lansman wrote a letter, causal connection, et cetera. But if I may, Your Honor, into the pit, it sounds as though this is some deep chasm. It's a real tension pastor pit was the gentleman's testimony. And apparently what I'm led to understand is what this is is simply about an 11-inch deep indention where they put the large rolls of newsprint for the presses. It's not as though he fell down into a chasm. We're not talking about the La Brea Tar Pits, is that right? Exactly, exactly. It's simply an indent in the floor where they put these rolls of paper. Nevertheless, he has a log according to the evidence, and he's pretty good about documenting things in his log. And yet he never mentions anything in his log about getting injured and seeing a newspaper doctor or anything about the incident in his log. Most of the other injuries, work injuries, even where there were reports of injury completed to memorialize them, are not mentioned in the log. On direct and cross-examination, Your Honor, Mr. Jernigan testified that the purpose of the log was for him to recount where he was and what he was doing. As far as for work, to track what weeks he worked, when he was entitled to a vacation week, apparently because he was out of the country so much of the time. When he got back, he was entitled to an extra week of vacation and that sort of thing. That was what he used that log to track. And it does track his behavior over a long period of time. Would it be nice? Would it be easier for me? Certainly, if there was something memorialized in there. But the petitioner did testify that on August 2nd of 2000, he contacted his supervisor immediately by email. There's nothing to rebut that, to tell him that he fell and that this was different. And my argument, Your Honors, would be that we all hear the common wisdom that a leopard can't change its spots. Well, George Jernigan was a leopard who, notwithstanding significant pain over the prior many years, was working more than 100 hours a week, six and seven days a week, doing whatever was necessary to keep his employer, Goss, and their customers happy. Let's assume all that is true. You seem to be indicating, I don't know if it's disputed, that George Jernigan was a good and diligent worker. That he was, I think you're sort of alluding to somewhat eccentric, if I'm getting your drift of what you're saying. He's a good worker, maybe a little bit eccentric. However, cutting to the chase, what does it have to do with whether or not the Commission's decision was against the manifest weight of the evidence? Tell us why they were wrong in this decision. Your Honor, we have an event that took place. And if anyone doubts that an event took place on that date, you need but look at the behavior of the gentleman prior to that date and subsequent to that date. It's a bright line. The man worked more than 100 hours a week at hard physical labor. Prior to that date, never performed physical labor again in his life after that date. Didn't he testify that he continued to work 18-hour days and was climbing the presses? In fact, he even said sometimes he had to climb them 15 times in 15 minutes? No, Your Honor, that is not correct. What Mr. Jernigan testified to, he was explaining the scope of his responsibilities. I believe those specific comments are prefaced by Mr. Jernigan's words to counsel at the time who was cross-examining him. Counsel, you don't understand the scope of what my responsibilities were at the time. But didn't he continue to work in Brazil and Colombia for a month after the date of the alleged injury? No, sir. What actually occurred and what Mr. Jernigan tried to explain, although, was that after the injury, at the time of the injury, when he reported it to Ronald Stewart, he requested that he be permitted to return home. He was told that there was no one to replace him. He needed to stay there and he needed to continue to Bogota to, I believe Mr. Jernigan's words were, to sign some papers so people could get paid or the guys could get paid, words to that effect. In other words, he needed to be there in whatever capacity he could for Goss Graphics International so that he could administer things. But he was no longer able to perform work. And as you can see, less than 48 hours after his return to the United States, even though he was on a paid vacation, he secured an appointment with his family doctor, Dr. Joseph Gimbel, and saw Dr. Gimbel. And then beyond that, your honors, he, on his own, he sought and secured permission from Traveler's Insurance, the work comp carrier at the time, for authority for an MRI, which Dr. Gimbel ordered on the 12th. And I said he sought and secured that permission. Did you point out to the commission when you were before them the errors that the arbitrator had made with respect to the evidence? Yes, I did, your honor. And what did they, did they say anything? There was no comment from the three commissioners sitting on the panel, your honor. Well, you had three able commissioners, Lamborn, Sherman, and Rank. Yes, your honor. And they... And I have argued before them many times. In about a half a page order, they affirmed the argument. Basically without comment. And I was, I was baffled. Well, did you ask them for a finding? Did you ask them for a finding? At the time of the argument, your honor? At the time of the decision of the commission. Did you ask them for a specific finding? Because you didn't like what they said, but they didn't say anything. Did you ask them? No, your honor. Can I, can I, you, you fixed the issue as the arbitrator finding the petitioner who's not injured in the course of his employment is against the manifest weight of the evidence. That's not really what the arbitrator said though, is it? The arbitrator just said you didn't prove it. He didn't say it didn't happen. He said you didn't prove it. And there's an entire, there's a big difference between the issue as you fix it and the wording of the arbitrator's opinion, which was adopted by the commission. The arbitrator writes, petitioner failed to prove the decedent sustained an accidental injury arising out of the course of his employment. He didn't say that he was not injured in the course of his employment. They're two different things. Yes, your honor. And, and, and the way we, we address that, your honor, is, okay, what, beyond his unrebutted testimony and beyond the, the, the fact that, that his actions prior and subsequent to the, the date of injury were night and day, beyond that, the only thing that, that petitioner could have tendered, the only thing he could possibly have tendered would have been the e-mail correspondence to Ron Stewart or from Ron Stewart, the, the field, the manager of field operations. Mr. Jernigan did not have access to his e-mail account. In the, in the capacity that, that he held with the company, making decisions concerning, you know, tens or hundreds of thousands of dollars for the company, he had no reason to believe that his word was going to be doubted. He didn't preserve these e-mails. And, and years later when, you know, his, his word was called into question, he didn't have access to the e-mails. Beyond that, we sought to subpoena Ron Stewart to, to provide testimony. Keeping in mind the claimant has a history of back problems. Yes, your honor. Put it specifically. What evidence is there in the record that establishes a causal connection between this alleged fall and his condition of ill, of ill-being? What evidence is there that establishes that? Physical evidence, your honor. Well, yeah, aside from the pre-existing back problems, okay, we already know he has that. He says nothing to the treating physicians for years. What evidence establishes the connection between the fall in Brazil and his condition of ill-being? Well, your honor, the, as I mentioned, there's an MRI that, that's done less than a week after he returns to the United States. And when compared as against the, the MRI that was taken a little more than a year prior, it shows a new injury, a significant new injury. And the combination of the significant new injury as recorded on the MRI with the night and day behavior prior to August 2nd of 2000 and subsequent to August 2nd of 2000, combined with the reporting of the accident the same day, combined with the recitations in the first report of accident report by Ron Stewart, Ron Stewart specifically states that he reported, that he, Ron Stewart, reported this accident to Human Resources on, on September 12th of 2000. And other than him being, again, being eccentric, what is the reason he doesn't tell his treating physician for five years that he fell into a pit? Please try to understand, your honors, that, that this gentleman had significant, truly significant pain that probably would have debilitated any of us from his prior work injuries.  To Mr. Jernigan's mind, I know, he, he believed, these doctors are prescribing me pain pills on a regular basis. These doctors know I have been seeing them for years for my lower back pain. These doctors know that I work in pain every day. These doctors, why is there no memorialization with Dr. Gimbel or, or Dr., the neurosurgeon who, who performed three surgeries on him of, of the three prior documented work injuries where accident reports were performed? Counsel, you'll have time on rebuttal now. Thank you, sir. Counsel, please. Counsel, thank you for providing the documents. Oh, you're welcome. The documents that the claimant's attorney, Superior Counsel, provided. Justices, Elaine Newquist on behalf of Goss Graphics. For once, I have very little to say. It's a manifest weight question, and the questions that the justices today have raised have been precisely the questions that we've had about this case from the start. If we are to believe that something as significant as falling into a pit on August 2nd, 2000, caused or in some way contributed to Mr. Jernigan's subsequent condition of ill-being, then why didn't he tell anybody? He continued working in some capacity both in Brazil and then in Colombia, did not return to the United States until September 8th. And he did two things in those next couple of days, neither of which were to report an injury. He made an appointment and went in and saw his family doctor on September 10th, at which time he told him that back pain I've been telling you about is progressing to the point that I can't take it anymore. And if you look at their family doctor's records, it goes on to talk about three and four and five years of back pain, so bad that many months before August 2nd, he said pretty much anything, sitting, standing, walking, was causing him severe back and leg pain. What is the next thing that Mr. Jernigan does? He contacts his employer and applies for vacation. Counsel talks about his client's record keeping, and this is a very bright, very detail-oriented man, who even kept his own log with respect to what was happening in his life. Not only does that log fail to reflect any history of injury, he says he treated with a doctor in Brazil, but there's no documentation of that log. Those records were never provided. And this detail-oriented man then comes back to the United States, applies for vacation, and September, I'm sorry, December of 2000, he's notified that the company is closing, he applies for disability, he applies for COBRA, he applies for long-term disability, and it's not until 2004 that he files an application for adjustment of claim, alleging an injury back in August of 2000 that at this point nobody's been paying for. In fairness, though, I mean, he did, there was some e-mail, and there was a report made fairly shortly after the alleged accident, which he said, I got hurt on the job. He talks about, there are two things. There's an August 3rd, 2000 e-mail that talks about a herniated disc emerging in August of 2000, and an October 15th, 2000 e-mail with reference to the fact that he is treating for his back and he doesn't understand why anybody isn't paying for it. But take that in the context of the fact that Trailers is an open claim and in fact begins paying benefits for a September 23rd, 1997 date, date of accident. He, in fact, then collects TTD and they pay medical bills until they get the IME from Dr. Caster in December of 2000 that finds he's at maximum medical improvement for that September 1997 incident. And that's pretty well documented, isn't it? Exactly. The insurance company started paying TTD based on the three-year earlier accident. Exactly. An incident which he, by the way, testified never even happened. Taking all of these factors into consideration, we would simply ask that the commission decision be approved. Counsel, let me ask you one final question. Admittedly, the behaviors of the claimant is inconsistent with some of what you sustained in Saxon in August of 2000. But when I asked counsel, opposing counsel, about a causal connection, he alluded to some MRI that he, over time, established some type of a new injury or new damage to the claimant. How do you respond to that? The MRI that counsel makes reference to that I believe is in September or October of 2000 shows progressive degenerative disc disease. The only doctor who ever talks about causal connection, per se, and I have one point of correction for the Justice's prior question. Mr. Jernigan never provides a history of this accident to any doctor. Dr. Lansman testifies in 2004, 2005, that Mr. Jernigan's attorney provided him a history of the accident in August of 2000. He then goes on to state that the findings in that MRI simply showed a progressive worsening of a condition which he ultimately concluded probably dated back to 93 or 96. It does not document a new or recent injury. No, it does not. Thank you all very much. Thank you, counsel. Rebuttal. Your Honors, the one and only medical report, when you were just questioning counsel concerning the TTD paid, we now know that it was paid relative to a claim that they had opened from 1997. It was not possible for Mr. Jernigan to have any idea that he was being paid relative to a claim in 1997. In all fairness to Mr. Jernigan, he watched his supervisor tender a report of a new accident that took place on August 2nd of 2000. He knew he was being paid. He had every reason to believe that he was receiving TTD benefits relative to a date of accident of August 2nd, 2000. And he should not be prejudiced simply because he did not hire counsel or pursue this matter through the commission for an additional two years or more. I would also point out that the MRI that I discussed is an MRI that was performed on September 19th, 2000, roughly seven days after Mr. Jernigan got back to this country, and that MRI was reviewed by the one and only physician's report that was made by the respondent, Dr. Steven Castor. And Dr. Castor specifically prefaces his comments by saying, I am going to assume that the apparent additional injury of August 2nd, 2000 is not included. So it seems as though everyone knew that there was an apparent additional injury of August 2nd, 2000, except Travelers Insurance. Everyone had notice of this accident. Mr. Jernigan believed he had done everything he needed to do to memorialize that the accident took place. I mean, he was in Brazil. He's in charge of field operations for the entire South American continent. He doesn't speak but a word of Spanish. When he saw the newspaper doctors, they gave him some pain medicine. And he had to tough it out until he got back home. And as has been admitted, the day he got back home, he's on the phone with his personal physician. And if I may, he didn't apply for vacation. He automatically had a week of vacation coming because he had been out of the country for so many months or weeks, whatever. An extended stay out of the country automatically bought him a week of vacation. But that was the one and only thing he did the minute he got back to the country. And because of all the correspondence that he had had with his supervisor, Ron Stewart, he didn't see that it was necessary to explore any of this. And if your honors look at the e-mail correspondence that was admitted, the few accident pieces that existed, it seems clear that from the tone of the e-mail from Mr. Stewart to HR that he wants them to get on this and get it done. There's no question in that e-mail. There's no ambivalence or ambiguity as to whether he believes a work accident took place. He doesn't say investigate this. He says get the man paid. Do what you need to do. This gentleman clearly had a work injury on August 2nd of 2000, and we're simply requesting that the matter be returned to the commission for further findings. Thank you, counsel. Thank you, your honors. The court will take the matter under advisory for disposition.